# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UFCW LOCAL 1776 AND PARTICIPATING EMPLOYERS PENSION FUND, individually and on behalf of all others similarly situated, | No. |
|  | CLASS ACTION COMPLAINT |
| Plaintiff, |  |
| v. | JURY TRIAL DEMANDED |
| BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CITIGROUP, INC.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO. LLC; J.P MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; UBS AG; and UBS SECURITIES LLC, |  |
| Defendants. |  |

1.      UFCW Local 1776 and Participating Employers Pension Fund ("Plaintiff") brings this action under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and Sections 4, 12 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a) and 26, on behalf of itself and other similarly-situated investors that bought, from the Defendants, unsecured bonds issued by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"); collectively, "Fannie and Freddie Bonds," or "FFBs."  As alleged herein, during the period beginning on at least January 1, 2009 and continuing through April 27, 2014 (the "Class Period"), Plaintiff and the proposed Class were harmed by buying FFBs at artificially inflated prices, and selling FFBs at artificially deflated prices as the result of collusion by the Defendants, the dominant group of financial firms licensed to deal FFBs to investors.  The Defendants completely dominated the secondary market for FFBs during the Class Period and used their market power to unlawfully raise resale prices of newly-issued FFBs and widen bid-ask spreads in the secondary trading market for FFBs to the detriment of investors such as Plaintiff and other Class members.

## NATURE OF THE ACTION

2.      The secondary market for FFBs issued by Fannie Mae and Freddie Mac is enormous in size: there are roughly $550 billion worth of FFBs outstanding.  FFBs and this figure refer only to unsecured bonds issued by Fannie Mae and Freddie Mac and do not include mortgage-backed securities issued by those entities.

3.      Despite the tremendous size and volume of the FFB market, it remains an over-the-counter ("OTC") market.  As such, only certain entities are licensed to purchase newly-issued FFBs from Fannie Mae and Freddie Mac and resell them to investors, or to trade past issues of FFBs with investors, and investors must call a salesperson employed by one of these licensed dealers to get a

price quote or engage in trading.

4.      The OTC secondary market for FFBs thus stands in sharp contrast to the New York Stock Exchange or NASDAQ, which enable banks and investors to see public information on stock prices in real-time, as trades occur.  Unlike investors in those stock markets, investors in the secondary market for FFBs only have access to intermittent price information regarding their own trades (and not any other investors' transactions) and only through their dealers.

5.      The closed, opaque nature of the FFB market makes it highly vulnerable to manipulation.  The small group of licensed dealers can easily coordinate to fix prices or widen bid-ask spreads, exploiting their superior knowledge and privileged market status to enrich themselves at the expense of investors.

6.      Defendants in this case are the select group of powerful financial firms licensed to deal FFBs to investors.  During the Class Period, these firms were the largest resellers of FFBs to the secondary market.  Defendants collectively underwrote $486 billion of these securities, or a whopping 64% of the total number of FFBs underwritten.  Given their massive share of the FFB market, Defendants could manipulate the price of FFBs that they sold to investors.  Defendants could easily wield their control of the FFB supply to fix prices — and they did.

7.      At issue in this litigation is Defendants' collusive scheme to fix prices during the Class Period, causing Plaintiff and the Class to overpay when buying newly-issued FFBs, and to pay excessive bid-ask spreads when trading FFBs in the secondary market.  This allegation of price fixing is supported by contemporaneous statistical evidence:  FFB pricing data (along with other market indicators) shows pricing trends consistent with price-fixing and the fixing of bid-ask spreads for the FFBs traded by Defendants during the Class Period.  Defendants' price fixing in the secondary FFB market is also the subject of ongoing investigations by the U.S. Department of

Justice ("DOJ").

8.     As alleged further herein, Defendants unlawfully manipulated the FFB market in at least three ways:  *First*, Defendants charged customers artificially inflated, supra-competitive prices for newly-issued FFBs.  This practice was highly profitable for Defendants given that a large percentage of their overall FFB sales volume occurred in the days immediately following a new FFB issuance by Fannie Mae or Freddie Mac.  Each Defendant was thus highly motived to artificially inflate prices for newly-issued FFBs by charging agreed-upon, supra-competitive prices to investors seeking to buy the new issue.

9.     *Second*, Defendants colluded to artificially raise the prices of the most recent issue of FFBs in the days prior to a new issuance of FFBs.  By inflating the prices of the most recently issued FFBs, Defendants created an artificially higher benchmark for the valuation of the newly-issued FFBs, and then sold that new issue at a higher price to investors.

10.     *Third*, Defendants colluded to widen "bid-ask" spreads.  Rather than competing amongst themselves to handle the FFB trades of would-be investors at bid-ask spreads that would be reduced to low levels through competition — as normally occurs in a financial market with many horizontal competitors — Defendants colluded to widen their respective bid-ask spreads, thereby forcing investors to accept higher purchase prices and lower sale prices than would occur in a competitive market.  Notably, after the Class Period (*i.e.*, after Defendants' price-fixing conspiracy had ended), bid-ask spreads in the FFB market markedly decreased for no apparent economic reason.  This evidence is consistent with an unlawful conspiracy amongst Defendants to fix and artificially widen bid-ask spreads during the Class Period.

11.     Further evidence of collusion is provided by the fact that after April 27, 2014, when the banks faced increased oversight and scrutiny in the wake of the LIBOR scandal and the

investigation into the banks' manipulation in the foreign exchange (FX) market, and regulators from a variety of government agencies forced Defendants to institute better internal controls to deter widespread anticompetitive conduct in their sales and trading businesses, statistical evidence of those three forms of collusion all rapidly declined.

12.     The evidence is thus clear that Defendants colluded to manipulate prices and bid-ask spreads in the FFB market to gain supra-competitive profits for themselves at the expense of FFB investors: Plaintiff and other Class members.  As a result of Defendants anticompetitive scheme, FFB investors — many of whom invested in FFBs for their supposed safety and liquidity — were instead repeatedly overcharged when buying, and/or underpaid when selling these securities.

13.     By and through their unlawful conspiracy, Defendants likely earned billions of dollars more in profits than they otherwise would have in a competitive market, at the expense of unwitting investors such as Plaintiff and members of the proposed Class.

14.     Plaintiff's economic injuries flowed directly from Defendants' collusive and anticompetitive manipulation of the secondary market for FFBs, and Defendants were fully aware of the foreseeable consequences of their collusive, manipulative, and anticompetitive conduct.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15(a), 22, and 26, and 28 U.S.C. §1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in the District; and a substantial portion of the affected

interstate trade and commerce described herein has been carried out in this District.

17.    Each Defendant is subject to personal jurisdiction.  Each Defendant transacted business in this District with customers throughout the United States, including in this District, including by transacting in FFBs with Plaintiff and/or members of the Class throughout the United States and in this District.  Plaintiff's claims arose from the fact that Defendants collusively fixed the prices of FFBs and widened bid-ask spreads for FFBs that they traded in this district with Plaintiff and members of the Class throughout the United States and in this District, thereby causing harm to Plaintiff and other members of the Class.

18.    Defendants' activities and those of their co-conspirators were within the flow of interstate commerce, and they were intended to have and did in fact have a substantial effect on interstate commerce.  During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal conspiracy.

19.    Defendants, directly or through subsidiaries, purposefully availed themselves of doing business in the United States and in this District by trading FFBs in this District with customers throughout the United States, and by purchasing FFBs from Fannie Mae and Freddie Mac that they later resold to customers in the United States.

20.    Defendants' collusive, manipulative, and anticompetitive conduct alleged herein had direct, substantial, and reasonably foreseeable effects on U.S. domestic commerce, and such effects gave rise to Plaintiff's claims.

## THE PARTIES

### A.    PLAINTIFF

21.    The UFCW Local 1776 and Participating Employers Pension Fund ("Plaintiff," or

the "Plan") is a Taft-Hartley pension plan developed in collective bargaining between UFCW Local 1776 and the Participating Employers that contribute to the Plan. The Plan is administered by a Board of Trustees comprised of an equal number of Employer Trustees and Union Trustees. The Plan office is located at 3031B Walton Road, Plymouth Meeting, PA 19462.

22.     The Plan is a defined benefit pension plan. Plan Trustees serve without compensation from the Plan. The Plan is financed by Participating Employer contributions made in accordance with the terms of collective bargaining agreements between UFCW Local 1776 and the Participating Employers. The Plan's Board of Trustees engage the services of an independent investment consultant to make recommendations with respect to the investment of the Plan's assets, and to assist it with selecting investment managers and monitoring the performance of the Plan's investments.

23.     Plaintiff transacted in FFBs during the Class Period directly with Defendants Bank of America, Citigroup, Deutsche Bank, and J.P. Morgan Securities, and as a result of Defendants' conduct, paid artificially excessive prices for newly-issued FFBs, and was overcharged on purchases of past-issued FFBs and underpaid on sales of those FFBs as a result of Defendants' collusive widening of bid-ask spreads, resulting in injury to its business or property.

**B.     DEFENDANTS**

24.     **Bank of America**:  Defendant Bank of America, N.A. ("BANA") is a national full-service commercial bank subsidiary of Bank of America Corporation.  Both Bank of America Corporation and Bank of American, N.A. are incorporated in Delaware with their headquarters located in Charlotte, NC.  Bank of America has operations in all 50 states of the United States, the District of Columbia and more than 40 countries.

25.     During the Class Period, BANA served as a licensed dealer of FFBs and transacted

in FFBs with Plaintiff and members of the Class.

26.     Defendant BANA purchased Defendant Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") on January 1, 2008 and merged it with its subsidiary Banc of America Securities LLC.  Bank of America Corporation also assumed all liabilities and obligations of Merrill Lynch on October 1, 2013.  Merrill Lynch was also a licensed dealer of FFBs and transacted in FFBs with members of the Class.

27.     Defendant BANA, during the period in which it was the parent company of Merrill Lynch, was responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

28.     **Barclays:**   Defendant Barclays Bank plc is a British multinational investment bank and financial services company.  Barclays Bank plc is a British private limited company, and is a direct, wholly owned subsidiary of Barclays plc, a British private limited company based in London, England.

29.     During the Class Period, Barclays transacted in FFBs with members of the Class.

30.     Defendant Barclays Capital Inc ("BCI"), is a Connecticut corporation based in New York, NY, and is a wholly subsidiary of Barclays Bank plc.  It has branches in at least 15 other cities around the United States.

31.     During the Class Period, BCI served as a licensed dealer of FFBs and transacted in FFBs with members of the Class.

32.     Barclays Bank plc gave BCI the authority to conduct, and was aware of, BCI's FFB transactions in the United States and in this District.  Barclays Bank plc benefited from those transactions and had some control over them.

33.     BCI's FFB transactions, whether with investors or with Fannie Mae and Freddie

Mac, are handled as part of Barclays Bank plc's "Barclays Investment Bank" division.  In fact, Barclays Bank plc posted on its website that Barclays Investment Bank integrates the functions that it performs for both issuers and investors, citing as an example BCI's role in both the issuance of new FFBs and FFB transactions with investors, which shows that Barclays Bank plc was aware of BCI's involvement and actions in the FFB market.

34.    Barclays Bank plc, as the parent company of BCI, was responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

35.    **BNP Paribas:**  Defendant BNP Paribas S.A. ("BNPP SA") is a French S.A. based in Paris, France.  It operates in 75 countries, and employs 15,000 people in the U.S.

36.    Defendant BNP Paribas Securities Corp. ("BNP Securities") is a Delaware corporation based in New York, NY that is a wholly owned subsidiary of BNPP SA.  BNP Securities is a licensed dealer for both Fannie Mae and Freddie Mac's FFBs. BNP Securities traded FFBs with investors in the United States from offices located in this District during the Class Period.

37.    BNPP SA, as the parent company of BNP Securities, handles many oversight functions for its subsidiary, including internal controls and compliance.  BNPP SA is responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

38.    **Citigroup**:  Defendant Citigroup, Inc., is an American multinational investment bank and financial services company.  It is a New York corporation based in New York, NY, and is the parent of Defendant Citigroup Global Markets Inc. ("CGMI").

39.    Defendant CGMI is a New York corporation based in New York, NY.  During the Class Period, CGMI was a licensed dealer of FFBs and transacted in FFBs with Plaintiff and

members of the Class.

40.    Citigroup Inc., as the parent company of CGMI, is responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

41.    **Credit Suisse:** Defendant Credit Suisse AG ("CS AG") is a multinational banking and financial services company.  CS AG is a Swiss AG based in Zurich, Switzerland.  CS AG's main American office is located in New York, NY, and is referred to as "Credit Suisse AG New York Branch. ("CSNY").  CSNY is a legal and operational extension of CS AG in the United States and operates as a division of CS AG and not as a separate entity.

42.    During the Class Period, CSNY was a licensed dealer of FBBs that transacted in FFBs with members of the Class.

43.    Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a Delaware corporation based in New York, NY and is a wholly owned subsidiary of CS AG.  CS Securities is a licensed dealer for both Fannie Mae and Freddie Mac.  During the Class Period, CS Securities transacted in FFBs with members of the Class.

44.    CS AG, as the parent company of CS Securities, handles many oversight functions for its subsidiary, including internal controls and compliance.  CS AG is responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

45.    **Deutsche Bank:** Defendant Deutsche Bank AG ("Deutsche Bank") is a German-incorporated multinational bank based in Frankfurt, Germany. Deutsche Bank has a New York branch based in this District, as well as U.S.-based subsidiaries such as Deutsche Bank Securities Inc.

46.    Defendant Deutsche Bank Securities Inc. is a Delaware corporation with its principal offices in New York, NY, and is a wholly-owned subsidiary of Deutsche Bank.  During

the Class Period, Deutsche Bank Securities served as a licensed dealer of FFBs and transacted in FFBs with Plaintiff and members of the Class.

47.    Deutsche Bank, as the parent company of Deutsche Bank Securities, is responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

48.    **Goldman Sachs & Co.:**    Defendant Goldman, Sachs & Co. is a New York corporation based in New York, NY.  During the Class Period, Goldman Sachs & Co. was a licensed FFB dealer and transacted in FFBs with members of the Class.

49.    **J.P. Morgan Chase.:** Defendant JP Morgan Chase Bank, National Association ("JP MNA") is a wholly owned "principal subsidiary" of JPMorgan Chase & Co., and is headquartered in New York, NY. During the Class Period, JP MNA transacted in FFBs with members of the Class.

50.    Defendant J.P. Morgan Securities LLC is a Delaware company with its principal offices in New York, NY, and is a wholly-owned subsidiary of JP MNA.  During the Class Period, J.P. Morgan Securities LLC served as a licensed dealer of FFBs and transacted in FFBs with Plaintiff and members of the Class and supplied FFBs that JP MNA traded with investors.

51.    Defendant J.P. Morgan Chase & Co., as the parent company of JP MNA and J.P. Morgan Securities LLC, handles many oversight functions for its subsidiaries, including internal controls and compliance.  J.P. Morgan Chase & Co. is responsible for its subsidiaries' legal compliance and for detecting and preventing any violations of applicable law.

52.    **UBS:** Defendant UBS AG is a Swiss-incorporated multinational bank based in Zurich, Switzerland.  UBS AG has several branch offices in the U.S., including in this District. During the Class Period, UBS AG transacted in FFBs with members of the Class.

53.    Defendant UBS Securities LLC is a Delaware company with its principal offices in New York, NY, and is a wholly-owned subsidiary of UBS AG.  During the Class Period, UBS Securities LLC was a licensed FFB dealer and transacted in FFBs with members of the Class.

54.    Defendant UBS AG, as the parent company of UBS Securities LLC handles many oversight functions for its subsidiary, including internal controls and compliance.  UBS AG is responsible for its subsidiary's legal compliance and for detecting and preventing any violations of applicable law.

55.    Whenever reference is made in this Complaint to any act, deed, or transaction of any Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, affiliates, employees, or representatives while such individuals or entities were actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs.

56.    Various other non-parties also participated as co-conspirators, performed acts, and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to identify other co-conspirators and to subsequently name some or all such co-conspirators, whether identified here or not, as Defendants.

57.    Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.   Each Defendant acted as the agent or co-conspirator of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

## I.    BACKGROUND ALLEGATIONS.

### Fannie Mae and Freddie Mac

58.    Fannie Mae and Freddie Mac are "government-sponsored entities" ("GSEs").  GSEs are private entities created and supported by the federal government to achieve a specific public purpose, in this case to provide liquidity and stability to the residential mortgage market, and to make mortgage loans affordable for consumers.  To that end, they provide easy access to capital on favorable terms to banks and mortgage companies that make residential mortgage loans.

59.    Fannie Mae and Freddie Mac finance operations by issuing debt, including unsecured bonds known as FFBs.  Fannie Mae and Freddie Mac issue FFBs several times a month. Each new issue of FFBs is typically identical or almost identical to past issues of FFBs, except for having a later maturity date.

### Characteristics of FFBs

60.    Because all FFBs are issued by Fannie Mae and Freddie Mac, they carry substantially similar levels of "credit risk," *i.e.*, the risk that Fannie Mae or Freddie Mac will default on its repayment obligations.  It should be noted that FFBs are not backed by the full faith and credit of the United States government, unlike, for example, U.S. treasury bonds. Although FFBs are not guaranteed by the federal government, their credit risk is generally considered very low because GSEs' connections to the federal government make default highly unlikely.

61.    In September 2008, during the financial crisis, Fannie Mae and Freddie Mac were placed under the conservatorship of the Federal Housing Finance Agency, which preserved the credit rating of FFBs and other GSE-issued bonds. Overall, the senior debt of the GSEs is rated AAA/Aaa, and their subordinated debt is rated AA-/Aa-.

62.    As unregulated, unregistered OTC issuances, FFBs are exempt from registration and reporting under the federal securities laws.

63.    Defendants each operate trading desks dedicated to FFB trading and sales.  Each

bank's FFB desk will trade all types of FFBs. This means that the same employees responsible for determining FFB pricing do so for all types of FFBs.

64.    FFBs each have a face value, maturity, and coupon payment, which can be used to calculate its "yield to maturity," which is the annual return that the holder of an FFB earns from the instrument.

65.    "Face value" is the amount that Fannie Mae or Freddie Mac will pay the holder of an FFB upon maturity.

66.    "Maturity" is the time from issuance until the face value is paid. The currently newest issue of FFBs is known as "on-the-run" FFBs, while older issues of FFBs are known as "off-the run" FFBs.

67.    FFBs with maturities of at least two years pay interest semi-annually at a fixed rate, although some have a variable rate based on a specific index. Since a fixed-rate FFB has a certain interest rate and maturity, it is possible to know the exact cash flows that the holder will receive. For example, an FFB with a $250,000 face value, a 4% interest rate, and a five-year maturity would entitle the user to receive $10,000 per year, paid as $5,000 every six months, and then to receive $250,000 after five years. However, the actual market value of a fixed-rate FFB varies inversely with the interest rate.

68.    FFBs with shorter maturities than two years, called "short-term FFBs," do not have coupon payments, but are issued at a discount to their face value. For example, an FFB with a one-year maturity with a face value of $250,000 might sell for $238,095.23, which would mean an interest rate of 5%.

### The Secondary Market for FFBs

69.    FFBs are only issued directly by Fannie Mae and Freddie Mac to a specific licensed

group of "Licensed FFB Dealers," who then resell them to investors such as Plaintiff and the Class and then trade with investors in the secondary market.  Licensed FFB Dealers also trade FFBs with one another as well as with investors.

70.    Fannie Mae and Freddie Mac have two ways to issue FFBs: (1) a "syndication" in which a group of Licensed FFB Dealers agree to purchase the entire issuance or (2) private auctions in which only Licensed FFB Dealers are allowed to participate.  These are collectively "FFB Primary Issuance."

71.    Licensed FFB Dealers profit from FFB Primary Issuance by purchasing FFBs that they later resell to investors for a profit.  Since Defendants are the largest Licensed FFB Dealers, they control a large part of the supply of newly-issued FFBs.

72.    Plaintiff and other investors do not participate in FFB Primary Issuance. Instead, they transact with Licensed FFB Dealers to invest in newly-issued FFBs or trade past issues of FFBs with Licensed FFB Dealers.

73.    The Department of Justice's Antitrust and Criminal divisions are now investigating the Defendants for price-fixing in the FFB market.

**Defendants Controlled the FFB Supply**

74.    Defendants bought a large percentage of the FFBs issued in FFB Primary Issuance during the Class Period, which gave them control of much of the supply of newly-issued FFBs.

75.    From March 1, 2010 through April 27, 2014, the Defendants collectively underwrote nearly $500 billion in FFBs, which is a nearly two-thirds share of all FFB underwriting. This has made entities of each Defendant among the eleven largest FFB underwriters.  Defendants' large share of the overall market enabled them to fix prices and bid-ask spreads effectively, creating huge profits for them at the detriment of Plaintiff and other investors.

**FFB Pricing**

76.     FFBs are valued in the secondary market by evaluating their yield to maturity against comparable debt securities.  U.S. Treasury securities are considered to be the lowest-risk debt securities, and so they are often used as a benchmark for the pricing of FFBs.

77.     FFB prices move in the opposite direction of the interest rate.  If an FFB with fixed payments has a 5% yield to maturity, and the interest rate rises to 6%, an investor could profit by selling the FFB and buying another debt security with comparable risk and liquidity that paid 6%.  This would cause the price of the FFB to fall until its yield to maturity corresponded to comparable debt securities.  If the interest rate fell to 4%, an investor could profit by selling other comparable debt securities and buying FFBs, which would raise FFB prices until their yield to maturity fell correspondingly.

78.     Despite the size of the FFB market, it is still an OTC market.  There is no centralized trading system where bids and offers are posted and automatically matched.  Instead, investors have to call or message a Licensed FFB Dealer to get price quotes or to buy or sell an FFB.  The price quotes are not publicized, and the only way to compare multiple quotes is to contact multiple Licensed FFB Dealers.  Often this is impractical given the speed at which the markets move, and so investors will typically not make many calls before completing a transaction.

79.     Licensed FFB Dealers earn profits by (1) buying newly-issued FFBs from Fannie Mae and Freddie Mac and reselling them to investors at a higher price and (2) buying past issues of FFBs from some investors at a lower price (the "bid" price) and reselling them to other investors at a higher price (the "ask" price).  The difference between the ask and bid prices is called the bid-ask spread, and the wider it is, the more profit the Licensed FFB Dealer will make on each trade.

80.     As an example, an FFB with maturity around one year from now, with no coupon

payments, and a face value of $10,000 might have a bid price of $9,450 and an ask price of $9,550. The Licensed FFB Dealer is willing to purchase FFBs with those criteria for $9,450 from investors and will sell those FFBs to investors for $9,550. The difference between the sale price of $9,550 and the purchase price of $9,450 is the bid-ask spread: $100. A Licensed FFB Dealer that buys an FFB for $9,450 from Investor A and sells that same FFB to Investor B for $9,550 would make $100 in profit.

81.     When a financial market is competitive, dealers have to compete against each other by offering higher purchase prices and lower sale prices. A dealer who has prices that are less favorable to investors will lose business to other dealers with better prices. This keeps bid-ask spreads to a reasonable level.

## II.      DEFENDANTS CONSPIRED TO FIX FFB PRICES CHARGED TO INVESTORS.

82.     Under the Obama Administration, the DOJ began an investigation of collusion in the FFB market.

83.     The DOJ Criminal Division and Antitrust Division are currently conducting investigations into collusion in the FFB market. That the investigation concerns the prices that Licensed FFB Dealers charged to FFB investors, such as Plaintiff and the Class. The investigation focuses on whether traders at different banks colluded to fix prices.

84.     Traders for various Defendant banks used private communication channels like chat rooms in order to organize and maintain their collusive scheme and fix prices and bid-ask spreads.

85.     Fannie Mae and Freddie Mac allocated underwriting positions of new FFB issues based on banks' performance in the secondary market. This gave the Defendants further incentives to collude in the secondary market, because it also allowed them to get larger shares of new FFB issues and perpetuate their profitable scheme to a greater degree.

86.     In centralized exchanged-based markets like the New York Stock Exchange and NASDAQ, bids and offers are posted publicly and in real-time for all market participants to see and access.  This makes collusion practically impossible – if a group of sellers got together and attempted to charge buyers an artificially high price for, say, Coca-Cola stock, it would be trivial for other sellers to charge lower prices and investors would just buy from them instead.  In OTC markets like the FFB market, investors aren't able to easily see the available bids and offers in real time but have to contact a licensed dealer to get a price quote.  Due to the time involved in contacting a dealer to get a price quote and make a trade, customers typically contact only one or a few dealers before transacting in FFBs.  This also makes collusion easier, because investors aren't able to easily and quickly compare prices from many sources.  If the price quotes from the small number of dealers are fixed by collusion, investors would not know the prices were fixed, would not know about the collusion, and would not have any alternative way to trade FFBs.

87.     Defendants had access to non-public trade data, which allowed them to enforce the conspiracy by checking on the compliance of other Defendants.  A Defendant that tried to charge competitive prices or bid-ask spreads and undercut the other conspirators would be found out by the other Defendants through trade data.

88.     The FFB sales and trading community is small, and it is common for personnel to move from one bank to another and retain connections with their past colleagues.  Also, the personnel in this community develop relationships at other banks through frequent trading of FFBs between banks.  These relationships provided them with the ability to collude with personnel at other banks, in some cases disguised as normal working calls or social relationships.

89.     Only a small number of banks control a large percentage of the overall FFB market, which also enables collusion.  It is easier to maintain a price and bid-ask cartel in a market

dominated by a few large banks than in a market where many entities each only have a small share of the overall market.

90.     The barriers to entry into the FFB market prevented other entities from entering the market and undercutting the Defendants' collusive prices and bid-ask spreads. Only licensed dealers are allowed to participate in FFB Primary Issuance and get access to the primary supply of FFBs that are later sold to investors. Also, being able to buy and sell FFBs in the quantities necessary to be a large-scale dealer requires having the resources necessary to acquire and carry a large inventory of FFBs and requires the dealer to assume the risk that changes in interest rates can rapidly change the value of its FFBs. These risks were reduced for the Defendants by collusion, but they would exist for a non-colluding party seeking to enter the FFB market.

## III.    ECONOMIC ANALYSIS CONFIRMS THE DEFENDANTS' COLLUSION.

91.     Economic analysis confirms that the Defendants colluded to fix and raise the prices of newly issued FFBs, to inflate the price of FFBs in the market prior to a new issuance, and to widen bid-ask spreads.

92.     The date April 27, 2014 is significant, because it is the date on which the DOJ's criminal investigation of FX traders was first publicly announced. This announcement sent shockwaves through the financial community, and collusive activity was greatly reduced after that date, as bank personnel who were previously engaged in collusion realized that they too could be caught. There were no significant factors in the broader economy around this time that would have caused massive changes in the FFB market, and so comparing the period before this date to the period after this date allows a good measure of collusion.

93.     Notes (FFBs with duration of 2-10 years) represent about 1/3 of total FFB volume. The difference in price between Defendants' purchase price of Notes from Fannie Mae or Freddie

Mac and their resale price of Notes to investors averaged 3.2 basis points from March 1, 2010 through April 27, 2014, but only 0.4 basis points from April 27, 2014 through December 31, 2017. If the Defendants were not colluding to artificially inflate the resale price of Notes to investors prior to April 27, 2014, this increase in price upon resale would have been comparable to the 0.4 basis points observed in the later period.

94.     The difference in price between the Defendants' purchase price of all FFBs, not just Notes, from Fannie Mae or Freddie Mac and their resale price of the FFBs to investors averaged 3.01 basis points from March 1, 2010 through April 27, 2014, but only 0.73 basis points from April 27, 2014 through December 31, 2017.

95.     U.S. Treasury bonds are a good benchmark for FFBs because they are also government-affiliated securities with very low credit risk and are affected by many of the same economic factors as FFBs, such as interest rates.

96.     Before April 27, 2014, Defendants' difference in price between the resale price of newly-issued FFBs as compared to the price of U.S. Treasury bonds with the same maturity was about 110 basis points, but after April 27, 2014 this difference was only about 15 basis points. There was no economic factor in the larger economy or that affected Fannie Mae or Freddie Mac that would have caused that shift.  If the Defendants were not colluding to artificially inflate the resale price of newly-issued FFBs to investors prior to April 27, 2014, this difference from U.S. Treasury bonds would have been more comparable to the 15 basis points in the later period.

97.     The most newly issued FFBs are more desirable than past-issued FFBs because they are more liquid.  Investors know that they have a better chance to resell a newly-issued FFB, and so it would normally have a premium over past-issued FFBs.  When there is about to be a new issue of FFBs, the most recent issue would normally experience a decline in investor interest and lower

prices as a result.

98.    However, this was not the case prior to April 27, 2014.  The most recent issue of Notes actually experienced a statistically significant price increase in the two days prior to a new issuance, indicating that Defendants were artificially inflating the price of the most recent issue so that they could charge higher prices for the new issue, as investors would use the inflated prices of the most recent issue as a benchmark to value the new Notes.  This trend ended after April 27, 2014, and there was no longer any statistically significant increase in the price of the most recent Notes prior to a new issuance.

99.    Bid-ask spreads were 1.85 basis points wider prior to April 27, 2014 as compared to afterwards, further indicating that Defendants' collusion extended to bid-ask spreads in the secondary trading market as well as to initial resales of FFBs they purchased from Fannie Mae and Freddie Mac.

100.    Normally, bid-ask spreads decline with greater liquidity.  First, the risk to a bank from holding FFBs declines when it can sell them more easily when necessary.  Second, in a more liquid market there is more competition between banks that reduces bid-ask spreads.

101.    Prior to April 27, 2014, bid-ask spreads actually increased with liquidity.  This only makes sense because of Defendants' collusion – a more liquid and active market meant more opportunities to profit from collusive prices and artificially wider bid-ask spreads.  This trend also ended after April 27, 2014.

## IV.    DEFENDANTS COLLUDED SIMILARLY IN OTHER FINANCIAL MARKETS.

102.    Defendants have been found to have colluded to fix prices, bid-ask spreads, and benchmark rates in many other financial markets in similar ways to their collusion in the FFB market.  This has caused government investigators to identify criminal activity, collusion that gave

rise to civil liability in private lawsuits, and the failure of the Defendants' compliance and oversight processes to properly identify and prevent these violations. There have been criminal convictions and settlements in the billions of dollars in lawsuits brought by private investors who experienced financial losses as a result of the Defendants' collusive behavior.

103.    These other cases both show that the collusion alleged herein using many of the same methods as have been proven in other cases is plausible, and that the Defendants had a pattern and practice of collusive behavior that was prevalent across many financial markets.

104.    In the foreign exchange market (FX market), traders used electronic chat rooms to collude to widen bid-ask spreads and manipulate benchmark rates, and illegally shared confidential customer information in order to trigger limit orders and stop-losses for even greater profits from market manipulation. Citigroup, Barclays, and J.P. Morgan entities pled guilty, while Credit Suisse, Deutsche Bank, and Goldman Sachs were also implicated and entered into consent orders with New York State authorities.

105.    The Defendant banks also colluded to manipulate interest rate benchmarks like LIBOR, Euribor, and Yen LIBOR. Banks found to have been involved include Barclays, Bank of America, Deutsche Bank, UBS, J.P. Morgan Chase, and Citigroup. These banks coordinated false submissions to the benchmark-setting panels, shared customers' order information, and manipulated market prices in order to move the benchmarks.

106.    Deutsche Bank, J.P. Morgan Chase, BNP Paribas, Bank of America, Citigroup, Goldman Sachs, and Barclays entities were also found to have manipulated the ISDAfix benchmark, which is used to calculate financial derivative prices.

107.    Numerous banks are now being investigated for price-fixing in the market for sub-sovereign and supranational agency bonds (SSA bonds), and there are also private lawsuits.

Deutsche Bank and Bank of America agreed to settle in August 2017 for over $65 million.

108.    In April 2017, the Mexican government announced that it had evidence of collusion in the market for Mexican government bonds.  Defendants implicated include Barclays, Citigroup, J.P. Morgan Chase, and Bank of America Corp.

## EQUITABLE TOLLING OF THE STATUTES OF LIMITATIONS

109.    Defendants actively and effectively concealed their collusion, as alleged herein, from Plaintiff and members of the Class.  As a result of Defendants' concealment, all applicable statutes of limitations affecting Plaintiff's and the Class' claims have been tolled.

110.    Defendants' conspiracy was, by its very nature, secretive and self-concealing. Defendants engaged in a form of market manipulation which could not be detected by Plaintiff or members of the Class.  The secret nature of Defendants' conspiracy, which relied on non- public methods of communication to collude with each other and other co-conspirators to manipulate the prices of and bid-ask spreads for FFBs, prevented Plaintiff and members of the Class from uncovering Defendants' unlawful conduct.  Plaintiff and members of the Class could not possibly have found out the contents of private chats, phone calls, or instant messages that occurred between personnel at various Defendants and could not reasonably have known about the conspiracy prior to the public announcement of the DOJ's investigation of the FFB market on June 1, 2018.

111.    Upon information and belief, Defendants also actively conspired to conceal their unlawful conduct.   Throughout the Class Period, Defendants, both individually and in concert, actively participated in the concealment of the scheme by misrepresenting to their customers that they were in compliance with applicable law, which prohibits collusion as described herein. Investors in the FFB market reasonably relied on the facts that Defendants are subject to and claim to abide by the law, including antitrust law, and that Defendants claim to have internal controls,

compliance departments, and oversight so as to prevent illegal activity. Investors would not have traded with the Defendants in the FFB market if they had known that this was not the case.

112.    Plaintiff therefore asserts that the applicable statute of limitations for its claim is tolled, and that Defendants are equitably estopped from claiming that the statute of limitations has run with respect to the Class Period asserted herein.

## CLASS ACTION ALLEGATIONS

113.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons or entities who, between at least January 1, 2009 and April 27, 2014 (the "Class Period"), purchased unsecured bonds issued by Fannie Mae or Freddie Mac ("FFBs") directly from a Defendant during the Class Period, or sold FFBs directly to a Defendant during the Class Period.

> Excluded from the Class are Defendants, Fannie Mae, and Freddie Mac, and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and persons who did not transact FFBs directly with Defendants but only purchased FFBs from or sold FFBs to entities other than the Defendants.

114.    Plaintiff believes that there are at least tens of thousands of members of the Class described above, making the Class so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

115.    There are questions of law and fact common to each member of the Class that relate to the existence of the conspiracy alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

> a.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, and/or

otherwise manipulate the prices of FFBs in violation of the Sherman
Antitrust Act;

b.    the identity of the participants in the conspiracy;

c.    the duration of the conspiracy;

d.    the nature and character of the acts performed by Defendants and their
co-conspirators in furtherance of the conspiracy;

e.    whether the conduct of Defendants and their co-conspirators, as
alleged in this Complaint, caused injury to Plaintiff and members of the
Class;

f.    whether Defendants and their co-conspirators concealed the
conspiracy's existence from Plaintiff and members of the Class;

g.    whether Defendants have acted or refused to act on grounds generally
applicable to the Class, thereby making appropriate final injunctive
relief or corresponding declaratory relief with respect to the Class as a
whole;

h.    the appropriate injunctive and equitable relief for the Class; and

i.    the appropriate measure of damages sustained by Plaintiff and
members of the Class.

116.    Plaintiff purchased FFBs directly from Defendants during the Class Period and
Plaintiff's interests are aligned with, and not antagonistic to, the interests of the other members of
the Class. Plaintiff is a member of the Class, has claims that are typical of the claims of the other

members of the Class, and will fairly and adequately protect the interests of the other members of the Class.  In addition, Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and other complex class action litigation.

117.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

118.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Moreover, prosecution of this litigation as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate antitrust claims such as the ones asserted in this Complaint.   This litigation presents no difficulties of management that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## VIOLATION OF § 1 OF THE SHERMAN ACT

120.    Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

121.    Defendants and their co-conspirators entered into and engaged in a combination

and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

122.    During the Class Period, Defendants, who are licensed dealers of FFBs or their parent entities and are horizontal competitors, conspired with one another to increase their profits by: (1) colluding to artificially inflate the prices of newly-issued FFBs, (2) colluding to artificially inflate the prices of the most recently-issued FFBs prior to a new issuance of FFBs, in order to artificially raise the resale price of the newly-issued FFBs, and (3) colluding to artificially widen bid-ask spreads in the secondary market for FFBs. Defendants thereby increased their profits by means of these illegal and collusive actions at the expense of investors such as Plaintiff and members of the Class.

123.    Defendants' anticompetitive actions caused Plaintiff and other Class members to: (1) pay artificially high prices for newly-issued FFBs that they purchased from Defendants, and (2) pay artificially high amounts to buy, or receive artificially low amounts when selling, FFBs in secondary market transactions with Defendants.

124.    Defendants' actions constitute a horizontal price-fixing conspiracy that is a *per se* violation of §1 of the Sherman Act. Alternatively, Defendants' actions resulted in substantial anticompetitive effects in the market for FFBs in the United States. Defendants' conspiracy to inflate the price of newly issued FFBs sold to United States investors, and to widen bid-ask spreads for FFB trading with United States investors, had no legitimate business justification and created no procompetitive benefits, nor did the overt acts taken by Defendants' personnel in furtherance of the conspiracy. Any supposed procompetitive benefits are false and pretextual or could have been achieved in a less restrictive manner.

125.    As a direct, material, and proximate result of Defendants' violation of Section 1

of the Sherman Antitrust Act, Plaintiff and members of the Class have suffered injury to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

126.    Plaintiff and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

127.    Plaintiff and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## **PRAYER FOR RELIEF**

Plaintiff demands relief as follows:

    a.    that the Court certify this lawsuit as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

    b.    that the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act;

    c.    that Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged herein;

    d.    that the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a);

    e.    that the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

    f.    that the Court direct any such further relief that it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 27, 2019               Respectfully submitted,

                                    */s/ John Radice*
                                    _____
                                    John Radice
                                    Daniel Rubenstein
                                    Eva Kane
                                    Natasha Fernandez-Silber
                                    **RADICE LAW FIRM, P.C.**
                                    475 Wall Street
                                    Princeton, NJ 08540
                                    Tel:    (646) 245-8502
                                    Fax:    (609) 385-0745
                                    jradice@radicelawfirm.com
                                    drubenstein@radicelawfirm.com
                                    ekane@radicelawfirm.com
                                    nsilber@radicelawfirm.com

                                    Eric L. Young (*pro hac vice* forthcoming)
                                    **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
                                    35 East State Street
                                    Media, PA 19063
                                    Tel:    (610) 891-9880
                                    eyoung@sfmslaw.com

                                    Jayne A. Goldstein (*pro hac vice* forthcoming)
                                    **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
                                    1625 N. Commerce Parkway, Suite 320
                                    Fort Lauderdale, FL 33326
                                    Tel:    (954) 515-0123
                                    jgoldstein@sfmslaw.com

                                    Linda P. Nussbaum (9336)
                                    Bart D. Cohen (*pro hac vice* forthcoming)
                                    Fred T. Isquith (FI-1064)
                                    **NUSSBAUM LAW GROUP, P.C.**

1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
Tel:    (917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
fisquith@nussbaumpc.com

*Attorneys for Plaintiff UFCW Local 1776 and
Participating Employers Pension Fund and the
proposed Class*